UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRACY L. BALDWIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-842 |
| | § | |
| ERIC H. HOLDER, JR., THE UNITED | § | |
| STATES ATTORNEY GENERAL, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 16.) After considering the parties' filings and the applicable law, the Court finds that the motion should be granted.

## I.    BACKGROUND

Plaintiff Tracy L. Baldwin was employed for nine years as a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI"). Plaintiff began her employment with the FBI in its Albuquerque, New Mexico office in 1997. (Doc. No. 16, Ex. 1, Tracy Baldwin Dep., Aug. 8, 2010, at 19-20.) During her time in Albuquerque, Plaintiff was suspended from work twice, once for five days and once for thirty-seven days. (*Id.* at 53.) The five-day suspension resulted from an incident in the fall of 2001 in which Plaintiff parked at the Albuquerque airport illegally and went inside to change an airline ticket, using her position as an FBI agent as an excuse for her parking. (*Id.* at 53-59.) The thirty-seven day suspension resulted from using an FBI vehicle to move personal belongings and for engaging in inappropriate physical contact with another FBI employee in an FBI

vehicle. (*Id.* at 59-62; Doc. No. 16, Ex. 3, at 1225-27.) While she was working for the FBI in Albuquerque, Plaintiff complained that certain FBI personnel engaged in sex discrimination against her, filing an Equal Employment Opportunity complaint ("EEO complaint") and eventually a federal lawsuit in September 2003. *See Baldwin v. Ashcroft*, Case No. 03-cv-3687 (S.D. Tex.). That lawsuit (which was transferred to the District of New Mexico in March 2004) was eventually settled before trial.

In December 2001, Plaintiff was transferred to the FBI's Houston office. (Baldwin Dep. at 37.) Her work there included conducting background investigations of government personnel. (*Id.* at 186-87.) Beginning in January 2004, she also served as the intern coordinator. (*Id.* at 106.)

Plaintiff presents evidence that she did her job competently and that her work was valued. Her 2003 and 2004 FBI Performance Appraisal Reports indicate that her work "Meets Expectations" in every relevant category. (Doc. No. 20, Ex. 1.) Her supervisors in Albuquerque provided a strong positive recommendation when she was transferred to Houston, indicating that Plaintiff has a good attitude and was hard-working, even in difficult circumstances. (Doc. No. 20, Ex. 2.) Several people complimented her work as intern coordinator, including FBI Associate Division Counsel Kevin Donnelly, a number of interns (included eight from 2004), and Sam Houston State University ("SHSU") Professor James Barrum ("Dr. Barrum"). (*See* Doc. No. 20, at 4-5, 10 (citing exhibits).) Indeed, Donnelly testified that Plaintiff "really set the standard for the [internship] program," and that "headquarters had called her and asked her to go other places to work on [it]." (Doc. No. 20, Ex. 3, Kevin Donnelly Dep., May 6, 2010, at 13-14.) Plaintiff also

provides statements made by twenty-two individuals over the years attesting to her good character and work. (Doc. No. 20, Ex. 5A.)

In the summer of 2004, Plaintiff began to have conflicts with a college intern from SHSU (hereinafter, "the Intern"). Plaintiff found the Intern's behavior strange—for example, at a presentation by a Magistrate Judge, the Intern sat with his hand over his face, rocked his head back and forth, and "picked at" his clothing. (Baldwin Dep. at 137-38.) Plaintiff testified that the Intern became very angry on two occasions when Plaintiff denied requests he made. On the first occasion, Plaintiff testified that when she denied the Intern's request to have a barbecue at his house during work hours as an intern function, the Intern's:

> [B]ody became very rigid. It was stiff like a board. He clinched his fists, both . . . and he held them down to his sides where his body was trembling—tremoring. I could see him shaking. And I saw in his face, he just got deep red. His lips were pursed, clinched. And he stood there in that posture shaking, glaring at me.

(Baldwin Dep. at 140-42, 229-30.) Plaintiff testified that she flinched because she was "wondering if he was going to hit me." (*Id.* at 231.) On the second occasion, Plaintiff testified that when she denied his request to extend his internship by one week, the Intern had a similar reaction, which frightened Plaintiff. (*Id.* at 142-44, 230-31.) Plaintiff testified that Danny Fuentes, an FBI agent who was present on the second occasion, told her that the Intern "was ready to come after you, he was bowed up at you in a heartbeat." (*Id.* at 143.)

In July 2004, several interns met with Acting Assistant Special Agent-in-Charge Russell Robinson and complained about Plaintiff's performance as intern coordinator. (*Id.* at 120-21.) Shortly thereafter, Plaintiff was removed as intern coordinator, and

Robinson granted the Intern's request for a short extension of his internship. (*Id.* at 124-25.) Plaintiff expressed her concerns about the Intern to Robinson on several occasions. (*Id.* at 126-29, 150-52.) She told Robinson that she was concerned in part because the Intern had been in the military and was familiar with firearms. (Doc. No. 20, Ex. 11, at 20.) Robinson agreed to reinstate Plaintiff as intern coordinator and to rescind the Intern's extension, though he told Plaintiff at the same meeting, referring to the Intern, "I don't even want to hear this kid's name again." (*Id.* at 151-52.)

The weekend of that meeting with Robinson, Plaintiff began to conduct Internet research on "negatively influential people" because she wondered "how in the world could a college student be so influential with high level FBI personnel . . . ." (Baldwin Dep. at 158-59.) She identified a number of similarities between the Intern and the serial killer Ted Bundy—such as seeming normal to most people, engaging in petty theft, and believing himself not subject to authority—and became convinced that the Intern could be dangerous to Plaintiff and others. (*Id.* at 159-62.) Plaintiff met with Dr. Barrum at his office at SHSU and conveyed her concerns regarding the Intern's supposed similarities to Bundy. (*Id.* at 165-70.) Plaintiff provided Dr. Barrum with some of the information she had found about Bundy on the Internet and told Dr. Barrum about how the events had unfolded in the FBI office, expressing her concern that the Intern was dangerous. (*Id.*) Dr. Barrum subsequently contacted other FBI personnel in Houston and told them that he "felt that [Plaintiff] had taken some extreme measures," that she "must have been under a great deal of stress and that she needed some psychological assistance," and that he "was deeply concerned about SA Baldwin's mental state and he wanted her to get the appropriate assistance." (Doc. No. 16, Ex. 5.)

On August 17, Plaintiff prepared an approximately hundred-page-long notebook organizing her investigation, to show to Blake McConnell, the FBI Houston division polygrapher, as she sought his opinion about the Intern's behavior. (*Id.* at 162-63.) In it, Plaintiff compared the Intern to Ted Bundy—including making a chart of forty-seven supposed similarities between the two men—and warned that the Intern was on a "***parallel Bundy track***" and was potentially "**at the brink of 'snapping.'**" (Doc. No. 17, Ex. 6 (emphasis in original).) The notebook includes an intricately-planned scenario for notifying the Intern of the concerns and informing him that he could not extend his internship and would not receive a positive evaluation. (*Id.* at 816-17.) The scenario describes Baldwin, several FBI SWAT team personnel, Dr. Barrum, and a dean from SHSU convening in a meeting room with the Intern, having told the Intern when he was invited that the FBI would like to hire him in the future, and having instructed him to bring a Director Certification and glass plaque that had been given to him. (*Id.*) The scenario includes such details as:

- SA Baldwin will chew gum, tear certificate, make faces in reaction to speaker "discipline" and click blue pen. No one can look in this direction.
- SWAT 2 + 3 will alternately correct any [of the Intern's] movement. Suspect leg jiggle to be first. Place hand on his shoulder (he does not like to be touched) and tell him to stop, he is being disrespectful. He must be kept still (no outlet for pressure he will feel).
- SWAT 4 stands out of [the Intern's] eye line and allows a "corridor" of opportunity to SA Baldwin. [The Intern] will perceive that he has true authority surrounding him (horseshoe), except for SA Baldwin. SWAT 4 position is crucial to protection of SA Baldwin. [The Intern] has no outlet but to lash out at SA Baldwin.
- Head table should have a skirt on it down to the floor. Place concrete (or other hard material) on floor between SA Baldwin and A/ASAC Robinson. Glass plaque is passed down, with each person stating how nice it is and A/ASAC Robinson stating that the FBI has them made in Buffalo, New York especially for the interns. A/ASAC Robinson hands glass plaque to SA Baldwin. SA Baldwin drop glass plaque during "sneeze." Everyone says, "bless you." Dr. Barrum provides a tissue that is passed down line to SA Baldwin. I say

"ooops" and A/ASAC Robinson says, "What a shame." SWAT 1 – "shush" [the Intern].

- A/ASAC Robinson…address each issue that [the Intern] wrote about in his [internship program] evaluation. Save the BBQ for last so I have a cue. "I have a signed statement from SA Baldwin that documents that when you presented yourself as the Intern spokesman for your little 'BBQ,' 4 Interns could not, or <u>would not</u> attend. "[Intern,] that is lack of candor. As SA Baldwin has told you repeatedly during the semester, te FBI does not tolerate lack of candor!"

(*Id.*) The notebook also contains "Case Recommendations" for further investigatory steps by Plaintiff and others at the FBI. (*Id.* at 717.)

Plaintiff also contacted an FBI information technology employee to inquire about obtaining emails from the Intern and another intern as part of her investigation. (Baldwin Dep. at 182.) Shortly thereafter, an assistant SAC permanently removed Plaintiff as intern coordinator.

On August 23, 2004, SA William Haman, the Chief Division Counsel in Houston, drafted an internal FBI recommendation, which was approved by Special Agent-in-Charge ("SAC") Roderick Beverly and Acting Assistant SAC Robinson. (Doc. No. 17, Ex. 7.) It described Plaintiff's conflicts with the Intern and her investigation relating to Bundy, referring to her "seemingly escalating obsession with this matter." (*Id.*) It stated that Plaintiff had improperly disseminated material outside the FBI (to Dr. Barrum) without obtaining approval from her supervisor and noted that "SA Baldwin's assigned duties in conducting background investigations seemed to be suffering during this period of time." (*Id.*) It recommended Plaintiff "for a psychological fitness for duty examination as soon as possible and refer[red] allegations of misconduct to [the Office of Professional Responsibility ("OPR")]." (*Id.*)

Beverley testified that, in approving the recommendation, he relied on information from Haman and two Assistant SACs and that he did not conduct an investigation on his own. (Doc. No. 20, Ex. 10, Roderick Beverley Dep., Aug. 18, 2010, at 7-8, 20.) Robinson testified that he recalled the decision to make the recommendations to OPR was made by three people—Haman, Beverly, and himself—and that he did not recall whether he changed anything from Haman's draft recommendation. (Doc. No. 20, Ex. 11, Russell Robinson Dep., May 14, 2010, at 46-47.)

On October 18, 2004, the FBI's Administrative Services office responded to the August 23 recommendation, and found that a psychological evaluation was not needed because:

> Although SA Baldwin has performed inappropriate actions against this intern, no evidence has been presented of overt thought disorder or emotional signs or symptoms suggestive of a major mental health diagnosis. The issues presented are more likely related to personality traits which are not medically actionable. Personality traits and disorders are not amenable to successful therapeutic intervention unless the individual recognizes that a problem exists and there is a desire to participate in the process of improvement.

(Doc. No. 17, Ex. 11, at 2150.) The Administrative Services office did, however, recommend that administrative actions should continue as the appropriate remedy for Plaintiff's behavior. (*Id.*)

On January 3, 2005, at OPR's request, Haman drafted an investigation report regarding Plaintiff's misconduct, and it was approved by Beverly. (Doc. No. 17, Ex. 19.) The report described the results of the investigation of Plaintiff, analyzed the factors relevant to whether a penalty was appropriate, *see Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 331-32 (M.S.P.B. 1981), and concluded that Baldwin should be terminated from the FBI. (*Id.*) Beverly testified that he did not make any changes to Haman's draft.

(Beverly Dep. at 20.) Beverly also testified that, while he sometimes speaks with employees before they are dismissed, he does not normally question the subject during the course of an investigation if the subject is available, and did not speak with Plaintiff prior to approving the report. (*Id.* at 9, 22.) He also testified that he never saw the documents that Plaintiff allegedly provided to Dr. Barrum at SHSU, and has no *first-hand* knowledge of Plaintiff acting insubordinate, providing documents to non-FBI personnel, or not being a truthful person. (*Id.* at 15, 24-25.) Plaintiff contends that the report improperly failed to consider mitigating evidence suggesting, for example, that Plaintiff had done in good job in her normal work and as intern coordinator.

Plaintiff was informed in January 2006 that the FBI was proposing her dismissal. (Baldwin Dep. at 191-92.) She provided a written submission to OPR and travelled with her attorney to FBI Headquarters to present her case before the OPR Review Panel. (*Id.* at 193.)

On April 7, 2006, OPR Assistant Director Candice Will signed a final termination letter to Plaintiff. (Doc. No. 17, Ex. 9.) It found that allegations against Plaintiff had been substantiated, and described the findings in detail. (*Id.*) It concluded that Plaintiff had 1) conducted an unauthorized investigation of an FBI intern; 2) engaged in unprofessional conduct and unauthorized disclosure by releasing information on an FBI intern to the intern's university without authority; 3) engaged in insubordination by failing to comply with a direct order to discontinue any further inquiry or investigation regarding the intern; and 4) lied under oath during the course of the administrative inquiry. (*Id.* at 2884.) The lying under oath charge was based on Plaintiff's stating in her sworn statement, "I do not recall [the Acting Assistant SAC] giving me a direct order. [Donnelly] was the only

management official that told me as of August 18, 2004, to drop the issue regarding [the Intern]." (*Id.* at 2897.) OPR found that, in the face of testimony from both [Robinson and Donnelly], Plaintiff's failure to recall that order was not credible. (*Id.*) The OPR letter notes that this is Plaintiff's "third substantiated OPR inquiry" during her seven years at the FBI and that she had been suspended for a total of 42 days for her prior misconduct. (*Id.* at 2899.) It then states, "It appears that you have learned little from your past misdeeds. Your disciplinary history, coupled with your misconduct in this matter, reflects a patterned disregard for Bureau rules and regulations." (*Id.*)

In reaching her decision, Will read the investigative report but did not personally interview witnesses except for Plaintiff. (Doc. No. 20, Ex. 13, Candice Will Dep., June 9, 2010, at 18-20.) For example, Will determined that Plaintiff had lied under oath based on the prior signed, sworn statements of other witnesses who contradicted Plaintiff. (*Id.* at 29.) Plaintiff testified that she offered to take a polygraph test but that Will and others did not agree to administer one to her. (Baldwin Dep. at 244-45.) Will later attested that she was not aware that Plaintiff had filed an EEO complaint until Plaintiff's dismissal hearing, although acknowledged that she would have read the written response submitted by Plaintiff's attorney prior to the hearing, which referenced the EEO complaint. (*Id.* at 12-16.)

Plaintiff alleges that Haman retaliated against her for her previous employment discrimination lawsuit by engineering her dismissal. Although the case was filed in September 2003, Plaintiff testified that she and her attorney began "working on this case diligently" in June 2004. (Baldwin Dep. at 74-75, 221.) Plaintiff also notes that discovery began on May 18, 2004 and that initial disclosures were due by July 30, 2004. (*See* Doc.

No. 20, Ex. 9.) Plaintiff testified that Haman was aware of her lawsuit, and that, even prior to June 2004, Haman's demeanor toward Plaintiff when she updated him about the lawsuit "was that he was disgusted with me . . . he would roll his eyes. He would put his feet up on the desk with his feet to me. He'd cross his arms." (Baldwin Dep. at 220.) She testified that when Haman gave Plaintiff her personnel file in June 2004, "he told me I could go wipe my butt with it," and that his demeanor toward her "just got worse and worse and worse as my time to work on the case got more intense." (Baldwin Dep. at 221-22.)

Assistant Division Counsel Donnelly testified that Haman told him in approximately the summer of 2004 that Plaintiff would be travelling to Albuquerque in relation to an EEO complaint she had filed. (Doc. No. 20, Ex. 3, at 6-7.) Donnelly also testified that Haman told him "it would not surprise him if Ms. Baldwin filed an EEO complaint against Houston management concerning the ongoing OPR inquiry concerning Ms. Baldwin's involvement with [the Non-Paid Intern Program]." (*Id.* at 7.) Donnelly speculated that Haman meant he would not be surprised if Baldwin filed another complaint because people who have filed one EEO complaint often file multiple complaints. (*Id.*) Donnelly referred to such people as "frequent filers." (*Id.*)

Plaintiff presents evidence of instances in which FBI agents who were found to have lied under oath, disclosed sensitive information, or conduct unauthorized investigations were given little or no punishment. (*See* Doc. No. 20, at 12-15.) She contends that she received a much harsher punishment than similarly situated employees.

Plaintiff brings this suit alleging retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, *et seq.*

## II.  LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.  LEGAL STANDARD FOR RETALIATION CLAIMS

Title VII makes it an unlawful employment practice for an employer:

[T]o discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or

> participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Under the *McDonnell Douglas* framework, the plaintiff first "has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show "(1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (citation omitted).

With regard to the third element, "a 'causal link' is established when the evidence demonstrates that the [adverse action] was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (citation omitted). "Although the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of [her] protected activity." *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003). "[T]he mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case." *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997). However, "[t]he plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision" in order to meet this burden. *Gee*, 289 F.3d at 345.

12

If a plaintiff makes out a prima facie case for retaliation, "the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action." *Id.* As the Supreme Court has explained this standard:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.

*Burdine*, 450 U.S. at 254 (citations and footnote omitted). "If the defendant satisfies this burden, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Gee*, 289 F.3d at 345. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

## IV.   ANALYSIS

### A.  PRIMA FACIE CASE

Defendant first argues that Plaintiff has not proven a causal link between her EEO complaint and her termination, and so has not made out a prima facie claim of retaliation. Plaintiff argues that she has demonstrated a causal link because the recommendation that led to her dismissal occurred close in time to her protected conduct, and her dismissal was engineered by Haman, who had shown animosity toward Plaintiff due to her discrimination lawsuit.

#### 1.  Temporal Proximity

Plaintiff argues that the closeness in time between her protected conduct and the retaliatory actions establishes a causal link. Although "[c]lose timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation," *Swanson*, 110 F.3d at 1188, the Fifth Circuit has found a lapse of five months to be insufficient, absent other evidence. *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002). The parties in this case dispute how to properly count the time lapse between the protected conduct and the allegedly retaliatory conduct. Plaintiff argues that the date from which to begin counting is mid-June, 2004, when she informed Haman of communications with her attorney in the lawsuit, and when she received her personnel file (along with alleged animosity and hostility from Haman). Haman drafted a recommendation that Plaintiff be investigated on August 23, 2004, so Plaintiff argues that the time lapse was only two months. Defendant argues that the counting should begin either when Plaintiff initiated her EEO complaint in March 2002 or when she provided a copy of the federal complaint to FBI officials in Houston in September 2003. Defendant argues that the allegedly retaliatory events should be counted either from when Plaintiff was actually terminated in April 2006 or from the August 2004 recommendation. Thus, Defendant argues that the time lapse was no less than eleven months, and as long as four years and one month.

The Fifth Circuit has looked to *the date an EEO complaint was filed* to calculate temporal proximity. *See, e.g.*, *Mitchell v. Snow*, 326 Fed. App'x 852, 856 n.6 (5th Cir. 2009) ("the complaint appears to be the relevant starting point"); *Strong v. University Healthcare System, L.L.C.*, 482 F.3d 802, 807-08 (5th Cir. 2007); *see also Hanks v.*

*Shinseki*, 2010 WL 3000835, at *7 (N.D. Tex. July 28, 2010) ("[the plaintiff's] reading of the law would allow an employee to restart the temporal-proximity clock simply by notifying her employer every time she did anything to prosecute her EEO complaint"); *id.* at *7 n.42 (citing cases). Because knowledge by the employer of the protected conduct is also required, the appropriate date to begin calculating temporal proximity in this case is September 2003, when Houston officials, including Haman, became aware of Plaintiff's federal discrimination complaint.[1] Therefore, the employers' knowledge of Plaintiff's protected conduct and the first action that began the process of Plaintiff's dismissal were approximately eleven months apart. Without more evidence, this is insufficient under Fifth Circuit precedent to meet Plaintiff's burden to show a causal link. *See, e.g., Raggs*, 278 F.3d at 472 (5th Cir. 2002) (five-month proximity insufficient).

## 2.  Haman's Retaliatory Intent

Beyond mere temporal proximity, Plaintiff argues that Haman showed animosity toward Plaintiff due to her discrimination lawsuit and that as a result he "engineered" her dismissal. In support of this contention, Plaintiff cites her own testimony that Haman told her she could "wipe [her] butt with" her personnel file, that Haman yelled at her but did not yell at agents who had not filed EEO complaints, and that his hostile demeanor—such as crossing his arms and rolling his eyes when talking to Plaintiff—intensified as a result of Plaintiff's discrimination lawsuit. (Baldwin Dep. at 221-22.)

---

[1] There may well be instances in which a significant change occurs in a plaintiff's discrimination lawsuit such that her employer's reaction would be different in kind from learning of the discrimination complaint to begin with. However, the Court need not decide that broader question, because the changes in the lawsuit that Plaintiff alleges are routine steps of discovery in any lawsuit—such as exchanging initial disclosures. Plaintiff has not presented evidence sufficient to create a factual issue as to whether any significant change occurred in her lawsuit after September 2003 such that a later date should be used for this purpose.

The Court finds that Plaintiff has presented sufficient evidence such that a reasonable jury could find a causal link between Haman's hostility and his investigation of Plaintiff. Plaintiff relies not only on her subjective belief, *see Peace v. Harvey*, 207 Fed. App'x. 366, 369 (5th Cir. 2006) (per curiam) ("[plaintiff's] subjective belief the incidents were retaliatory, without more, is not sufficient to survive summary judgment"), but also on her testimony about specific statements and actions Haman took. In addition, Haman's initial recommendation to OPR was made only a month after his alleged hostile statement and demeanor, so it is a reasonable inference that his hostility affected the existence and/or contents of his recommendation.[2] At the summary judgment stage, the Court must "refrain from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Although Plaintiff's testimony by no means conclusively proves that Haman retaliated against Plaintiff because of her lawsuit, it is sufficient to raise genuine issues of material fact on that question.

### 3.  "Cat's Paw" Theory

However, even if Haman conducted an investigation of Plaintiff and recommended her termination in retaliation for her protected conduct, Plaintiff still must show that a *decisionmaker* retaliated against her. In this case, Plaintiff does not contend that Haman was a decisionmaker, but rather that Will, as the decisionmaker, relied on Haman's representations rather than conducting her own investigation.

---

[2] As noted above, for purposes of proving a causal link through temporal proximity alone, the timing is generally counted from the date an EEO complaint was filed and the employer knew about it. However, evidence tending to prove that retaliatory behavior occurred in reaction to another event in a plaintiff's discrimination complaint process is still *relevant* to whether a causal link exists.

While the "statements and actions of ordinary employees are normally not imputable to the employer," "when the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact." *Gee*, 289 F.3d at 346 (citations omitted); *see also Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001) ("where the decision-maker 'rubber-stamps' the firing recommendation of subordinates . . . the decision-maker acts as a conduit of the subordinates' improper motive").[3] However, "the causal link between the protected conduct and termination is broken where the official with final authority to fire employees conducts an "independent investigation" in the course of reaching his or her decision." *Id.* "The ultimate question, therefore, is whether the employee can demonstrate that others had influence or leverage over the official decisionmaker." *Gee*, 289 F.3d at 346 (citations omitted).

The Court finds that Will sufficiently conducted an independent review of Plaintiff's alleged misconduct to break the causal link. Although Haman had "influence" over Will in some sense of the word, the cat's paw doctrine in the Fifth Circuit does not impute to the decisionmaker the conduct of a subordinate in every case in which the subordinate in any way participated in an initial investigation. If Will had unquestioningly accepted Haman's conclusions, as Plaintiff alleges, the causal link would

---

[3] As the Tenth Circuit has explained:

> The "cat's paw" doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. *See* Fables of La Fontaine 344 (Walter Thornbury trans., Chartwell Books 1984). As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat. *Id.* Today the term "cat's-paw" refers to "one used by another to accomplish his purposes." Webster's Third New International Dictionary Unabridged 354 (2002). In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

*EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006), *cert. dismissed*, 549 U.S. 1334 (2007).

remain intact. However, after Haman drafted the recommendation to OPR to investigate Plaintiff and an investigation report including an analysis of the *Douglas* factors, his conclusions were approved by two other officials in Houston prior to being sent to OPR. Plaintiff presents evidence that those officials did not conduct a full investigation and relied in part on Haman's investigation, although Beverly testified that, in addition to Haman, he relied on information from two assistant SACs, and spoke to Dr. Barrum, in approving the recommendation regarding Plaintiff. (Beverly Dep. at 7-8, 13-14.) After receiving the reports from the Houston office, the FBI's Inspection Division—in which Haman has no involvement—conducted an investigation for OPR regarding the charges against Plaintiff. (Doc. No. 21, Ex. A.)[4] Plaintiff submitted a written response, and presented arguments at a hearing before OPR. Will then reviewed the entire investigative file, including the documents from Houston, the Inspection Division's report, and arguments made by Plaintiff, and wrote a seventeen-page letter to Plaintiff describing the reasons for her decision. (Doc. No. 21, Ex. B.) In addition, the lying-under-oath charge was not made in the documents drafted by Haman, but rather added by Will after she reviewed the investigative file and concluded that Plaintiff had lied in her signed, sworn statement to OPR. (*Id.* at 362-364.) Accordingly, the Court finds that no genuine issues of material fact remain; Will acted not as the cat's paw to Haman's monkey, but rather conducted an independent evaluation of the charges sufficient to break the causal link. Accordingly, Plaintiff has failed to prove a prima facie case of retaliation.

## B. LEGITIMATE NON-DISCRIMINATORY REASONS

---

[4] Plaintiff moves for the Court to strike the evidence Defendant presented as exhibits to his reply brief on the grounds that they amount to a second summary judgment motion made after the deadline for dispositive motions and without leave of the court. (*See* Doc. No. 22, at 1-2.) The Court finds it appropriate to consider the exhibits, as they respond to arguments presented in Plaintiff's response brief, and because Plaintiff has had the opportunity to present a sur-reply responding to the new evidence.

Even if Plaintiff had established a prima facie case, Defendant argues that the FBI had legitimate, non-discriminatory reasons for terminating Plaintiff's employment. The Court finds that Defendant has met his burden to "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection" sufficiently to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *See Burdine*, 450 U.S. at 254.

The FBI went through its internal investigation process and found that Plaintiff had 1) conducted an unauthorized investigation of an intern; 2) engaged in unprofessional conduct and unauthorized disclosure by released information about the intern to his university without authority; 3) engaged in insubordination by failing to comply with a direct order to discontinue any further inquiry or investigation regarding the intern; and 4) lied under oath. (*See* Doc. No. 17, Ex. 9.) Furthermore, Plaintiff had previously been suspended twice for violations of FBI policies, and Will, the Assistant Director of OPR, concluded that Plaintiff's behavior "reflects a patterned disregard for Bureau rules and regulations." (*Id.* at 2899.) Will found that Plaintiff's "misconduct in this matter seriously calls into question [her] ability to exercise the sound professional judgment required of an FBI Special Agent." (*Id.* at 2894.) These reasons are certainly sufficient to "raise an issue of fact" about whether the FBI's dismissal of Plaintiff was retaliatory.

### C. PRETEXT

Because Defendant has met his burden to present evidence of a legitimate non-discriminatory reason for Plaintiff's dismissal, the burden shifts back to Plaintiff to prove that Defendant's "stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Gee*, 289 F.3d at 345. Plaintiff alleges that her termination was

"engineered by" Haman in retaliation for Plaintiff's discrimination lawsuit. In support of this contention, Plaintiff contends that none of the charges that led to her termination are supported by evidence, and that other employees who have been found to have committed similar infractions have not faced as severe of penalties.

Plaintiff's first line of argument—that the FBI's conclusion that she had committed misconduct was unsupported by the evidence—is foreclosed by controlling precedent. The Fifth Circuit has held that "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason." *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991); *see also LeMaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 391 (5th Cir. 2007) ("Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext."). Rather than "try[ing] in court the validity of good faith beliefs as to an employee's competence[,] [m]otive is the issue." *Little*, 924 F.2d at 97. Accordingly, whatever merit Plaintiff's factual contentions about the grounds for her dismissal may have, they do not demonstrate pretext without evidence of an improper motive. There is no evidence that Will intended to retaliate against Plaintiff. Nor, as discussed above, is there evidence that Will merely rubber-stamped Haman's recommendations rather than conducted an independent inquiry. Accordingly, Plaintiff fails to prove the existence of a pretext on this basis.

Plaintiff's second argument—that similarly-situated FBI employees were given less severe punishments than she was—also fails. "Disparate treatment of similarly situated employees is one way to demonstrate unlawful discrimination and retaliation." *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). "To raise an

inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals." *Id.* "[A] plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001) (citations omitted). "Nearly identical" is not, however, "synonymous with 'identical.'" *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009); *see also id.* ("a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical").

In this case, Plaintiff has not demonstrated that employees under *nearly identical* circumstances were treated differently. OPR's decision to dismiss Plaintiff was based in part on her two prior suspensions for violations of FBI rules, and on the conclusion that her conduct reflected "a patterned disregard for Bureau rules and regulations." (Doc. No. 17, Ex. 9, at 2899.) Plaintiff has presented no evidence that the agents she claims are similarly situated had any record of past misconduct or had been found to have shown a "patterned disregard" for FBI rules. It cannot be said that employees with no past record of misconduct or suspensions are situated nearly identically to Plaintiff. *See Lee*, 574 F.3d at 261 ("Each employee's track record at the company need not comprise the identical number of identical infractions, albeit *these records must be comparable*.")

(emphasis added).[5] Accordingly, Plaintiff has failed to demonstrate pretext based on similarly-situated employees being treated differently.

## V.    CONCLUSION

For the reasons discussed in this order, the Court **GRANTS** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED**.

**SIGNED** this 24th day of February, 2011.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[5] The exhibit Plaintiff relies on lists only one allegation of misconduct for each individual—for example, providing false information, disclosure of classified information, or unprofessional conduct. Even for Plaintiff, it lists only "unauthorized disclosure of sensitive information" although OPR also found her to have engaged in insubordination and lying under oath. Thus, the Court cannot tell based on that evidence whether even the final instances of misconduct by Plaintiff and the others are "nearly identical." This lack of detail may be due solely to a shortcoming in FBI record-keeping. Even assuming that the final instances of misconduct are identical, however, the lack of previous misconduct by others is fatal to Plaintiff's claim that the other employees were similarly situated.