UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRACY L. BALDWIN, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-842 |
| | § | |
| ERIC H. HOLDER, JR., THE UNITED | § | |
| STATES ATTORNEY GENERAL, | § | |
| | § | |
| **Defendant.** | § | |

<u>AMENDED MEMORANDUM AND ORDER</u>

THE MEMORANDUM AND ORDER DATED FEBRUARY 24, 2011 IS WITHDRAWN, AND THIS AMENDED MEMORANDUM AND ORDER IS SUBSTITUTED.

This Amended Memorandum and Order is issued after the Court has had the opportunity to review the parties' briefing and arguments regarding Plaintiff's Motion to Alter Judgment (Doc. No. 26), and to consider the Supreme Court's recent opinion in *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011).

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 16.) After considering the parties' arguments and the applicable law, the Court finds that the motion should be denied.

I.      BACKGROUND

Plaintiff Tracy L. Baldwin was employed for nine years as a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI"). Plaintiff began her employment with the FBI in its Albuquerque, New Mexico office in 1997. (Doc. No. 16, Ex. 1, Tracy

Baldwin Dep., Aug. 8, 2010, at 19-20.) During her time in Albuquerque, Plaintiff was suspended from work twice, once for five days and once for thirty-seven days. (*Id.* at 53.) The five-day suspension resulted from an incident in the fall of 2001 in which Plaintiff parked at the Albuquerque airport illegally and went inside to change an airline ticket, using her position as an FBI agent as an excuse for her parking. (*Id.* at 53-59.) The thirty-seven day suspension resulted from using an FBI vehicle to move personal belongings and for engaging in inappropriate physical contact with another FBI employee in an FBI vehicle. (*Id.* at 59-62; Doc. No. 16, Ex. 3, at 1225-27.) While she was working for the FBI in Albuquerque, Plaintiff complained that certain FBI personnel discriminated against her on the basis of her sex, and she filed an Equal Employment Opportunity complaint ("EEO complaint") and eventually a federal lawsuit in September 2003. *See Baldwin v. Ashcroft*, Case No. 03-cv-3687 (S.D. Tex.). That lawsuit (which was transferred to the District of New Mexico in March 2004) was eventually settled before trial.

In December 2001, Plaintiff was transferred to the FBI's Houston office. (Baldwin Dep. at 37.) Her work there included conducting background investigations of government personnel. (*Id.* at 186-87.) Beginning in January 2004, she also served as the intern coordinator. (*Id.* at 106.)

Plaintiff presents evidence that she did her job competently and that her work was valued. Her 2003 and 2004 FBI Performance Appraisal Reports indicate that her work "Meets Expectations" in every relevant category. (Doc. No. 20, Ex. 1.) Her supervisors in Albuquerque provided a strong positive recommendation when she was transferred to Houston, indicating that Plaintiff has a good attitude and was hard-working, even in

2

difficult circumstances. (Doc. No. 20, Ex. 2.) Several people complimented her work as intern coordinator, including FBI Associate Division Counsel Kevin Donnelly, a number of interns (including eight from 2004), and Sam Houston State University ("SHSU") Professor James Barrum ("Dr. Barrum"). (*See* Doc. No. 20, at 4-5, 10 (citing exhibits).) Indeed, Donnelly testified that Plaintiff "really set the standard for the [internship] program," and that "headquarters had called her and asked her to go other places to work on [it]." (Doc. No. 20, Ex. 3, Kevin Donnelly Dep., May 6, 2010, at 13-14.) Plaintiff also provides statements made by twenty-two individuals over the years attesting to her good character and work. (Doc. No. 20, Ex. 5A.)

In the summer of 2004, Plaintiff began to have conflicts with a college intern from SHSU (hereinafter, "the Intern"). Plaintiff found the Intern's behavior strange—for example, at a presentation by a Magistrate Judge, the Intern sat with his hand over his face, rocked his head back and forth, and "picked at" his clothing. (Baldwin Dep. at 137-38.) Plaintiff testified that the Intern became very angry on two occasions when Plaintiff denied requests he made. On the first occasion, Plaintiff testified that, when she denied the Intern's request to have a barbecue at his house during work hours as an intern function, the Intern's:

> [B]ody became very rigid. It was stiff like a board. He clinched his fists, both . . . and he held them down to his sides where his body was trembling—tremoring. I could see him shaking. And I saw in his face, he just got deep red. His lips were pursed, clinched. And he stood there in that posture shaking, glaring at me.

(Baldwin Dep. at 140-42, 229-30.) Plaintiff testified that she flinched because she was "wondering if he was going to hit me." (*Id.* at 231.) On the second occasion, Plaintiff testified that, when she denied his request to extend his internship by one week, the Intern

3

had a similar reaction, which frightened Plaintiff. (*Id.* at 142-44, 230-31.) Plaintiff testified that Danny Fuentes, an FBI agent who was present on the second occasion, told her that the Intern "was ready to come after you, he was bowed up at you in a heartbeat." (*Id.* at 143.)

In July 2004, several of the thirteen summer interns met with Acting Assistant Special Agent-in-Charge Russell Robinson and complained that Plaintiff's performance as intern coordinator, stating that she was mean, among other things. (*Id.* at 120-21, 123.) Shortly thereafter, Plaintiff was removed as intern coordinator, and Robinson granted the Intern's request for a short extension of his internship. (*Id.* at 124-25.) Plaintiff expressed her concerns about the Intern to Robinson on several occasions. (*Id.* at 126-29, 150-52.) She told Robinson that she was concerned in part because the Intern had been in the military and was familiar with firearms. (Doc. No. 20, Ex. 11, at 20.) Robinson agreed to reinstate Plaintiff as intern coordinator and to rescind the Intern's extension, though he told Plaintiff at the same meeting, referring to the Intern, "I don't even want to hear this kid's name again." (*Id.* at 151-52.)

The weekend after that meeting with Robinson, Plaintiff began to conduct Internet research on "negatively influential people" because she wondered "how in the world could a college student be so influential with high level FBI personnel . . . ." (Baldwin Dep. at 158-59.) She identified a number of similarities between the Intern and the serial killer Ted Bundy—such as seeming normal to most people, engaging in petty theft, and believing himself not subject to authority—and became convinced that the Intern could be dangerous to Plaintiff and others. (*Id.* at 159-62.) Plaintiff met with Dr. Barrum at his office at SHSU and conveyed her concerns regarding the Intern's supposed similarities to

Bundy. (*Id.* at 165-70.) Plaintiff provided Dr. Barrum with some of the information she had found about Bundy on the Internet and told Dr. Barrum about how the events had unfolded in the FBI office, expressing her concern that the Intern was dangerous. (*Id.*) Dr. Barrum subsequently contacted other FBI personnel in Houston and told them that he "felt that [Plaintiff] had taken some extreme measures," that she "must have been under a great deal of stress and that she needed some psychological assistance," and that he "was deeply concerned about SA Baldwin's mental state and he wanted her to get the appropriate assistance." (Doc. No. 16, Ex. 5.)

On August 17, Plaintiff prepared an approximately hundred-page-long notebook organizing her investigation, to show to Blake McConnell, the FBI Houston division polygrapher, as she sought his opinion about the Intern's behavior. (*Id.* at 162-63.) In it, Plaintiff compared the Intern to Ted Bundy—including making a chart of forty-seven supposed similarities between the two men—and warned that the Intern was on a "***parallel Bundy track***" and was potentially "**at the brink of 'snapping**.'" (Doc. No. 17, Ex. 6 (emphasis in original).) The notebook includes an intricately-planned scenario for notifying the Intern of the concerns and informing him that he could not extend his internship and would not receive a positive evaluation. (*Id.* at 816-17.) The scenario describes Baldwin, several FBI SWAT team personnel, Dr. Barrum, and a dean from SHSU convening in a meeting room with the Intern, having told the Intern when he was invited that the FBI would like to hire him in the future, and having instructed him to bring a Director Certification and glass plaque that had been given to him. (*Id.*) The scenario includes such details as:

- SA Baldwin will chew gum, tear certificate, make faces in reaction to speaker "discipline" and click blue pen. No one can look in this direction.
- SWAT 2 + 3 will alternately correct any [of the Intern's] movement. Suspect leg jiggle to be first. Place hand on his shoulder (he does not like to be touched) and tell him to stop, he is being disrespectful. He must be kept still (no outlet for pressure he will feel).
- SWAT 4 stands out of [the Intern's] eye line and allows a "corridor" of opportunity to SA Baldwin. [The Intern] will perceive that he has true authority surrounding him (horseshoe), except for SA Baldwin. SWAT 4 position is crucial to protection of SA Baldwin. [The Intern] has no outlet but to lash out at SA Baldwin.
- Head table should have a skirt on it down to the floor. Place concrete (or other hard material) on floor between SA Baldwin and A/ASAC Robinson. Glass plaque is passed down, with each person stating how nice it is and A/ASAC Robinson stating that the FBI has them made in Buffalo, New York especially for the interns. A/ASAC Robinson hands glass plaque to SA Baldwin. SA Baldwin drop glass plaque during "sneeze." Everyone says, "bless you." Dr. Barrum provides a tissue that is passed down line to SA Baldwin. I say "ooops" and A/ASAC Robinson says, "What a shame." SWAT 1 – "shush" [the Intern].
- A/ASAC Robinson…address each issue that [the Intern] wrote about in his [internship program] evaluation. Save the BBQ for last so I have a cue. "I have a signed statement from SA Baldwin that documents that when you presented yourself as the Intern spokesman for your little 'BBQ,' 4 Interns could not, or <u>would not</u> attend. "[Intern,] that is lack of candor. As SA Baldwin has told you repeatedly during the semester, the FBI does not tolerate lack of candor!"

(*Id.*) The notebook also contains "Case Recommendations" for further investigatory steps by Plaintiff and others at the FBI. (*Id.* at 717.)

Plaintiff also contacted an FBI information technology employee to inquire about obtaining emails from the Intern and another intern as part of her investigation. (Baldwin Dep. at 182.) Shortly thereafter, an assistant SAC permanently removed Plaintiff as intern coordinator.

On August 23, 2004, SA William Haman, the Chief Division Counsel in Houston, drafted an internal FBI recommendation, which was approved by Special Agent-in-

Charge ("SAC") Roderick Beverly and Acting Assistant SAC Robinson. (Doc. No. 17, Ex. 7.) It described Plaintiff's conflicts with the Intern and her investigation relating to Bundy, referring to her "seemingly escalating obsession with this matter." (*Id.*) It stated that Plaintiff had improperly disseminated material outside the FBI (to Dr. Barrum) without obtaining approval from her supervisor and noted that "SA Baldwin's assigned duties in conducting background investigations seemed to be suffering during this period of time." (*Id.*) It recommended Plaintiff "for a psychological fitness for duty examination as soon as possible and refer[red] allegations of misconduct to [the Office of Professional Responsibility ("OPR")]." (*Id.*)

Beverley testified that, in approving the recommendation, he relied on information from Haman and two Assistant SACs and that he did not conduct an investigation on his own. (Doc. No. 20, Ex. 10, Roderick Beverley Dep., Aug. 18, 2010, at 7-8, 20.) Robinson testified that he recalled the decision to make the recommendations to OPR was made by three people—Haman, Beverly, and himself—and that he did not recall whether he changed anything from Haman's draft recommendation. (Doc. No. 20, Ex. 11, Russell Robinson Dep., May 14, 2010, at 46-47.)

On October 18, 2004, the FBI's Administrative Services office responded to the August 23 recommendation, and found that a psychological evaluation was not needed because:

> Although SA Baldwin has performed inappropriate actions against this intern, no evidence has been presented of overt thought disorder or emotional signs or symptoms suggestive of a major mental health diagnosis. The issues presented are more likely related to personality traits which are not medically actionable. Personality traits and disorders are not amenable to successful therapeutic intervention unless the individual recognizes that a problem exists and there is a desire to participate in the process of improvement.

(Doc. No. 17, Ex. 11, at 2150.) The Administrative Services office did, however, recommend that administrative actions should continue as the appropriate remedy for Plaintiff's behavior. (*Id.*)

On January 3, 2005, at OPR's request, Haman drafted an investigation report regarding Plaintiff's misconduct, and it was approved by Beverly. (Doc. No. 17, Ex. 19.) The report described the results of the investigation of Plaintiff, analyzed the factors relevant to whether a penalty was appropriate, *see Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 331-32 (M.S.P.B. 1981), and concluded that Baldwin should be terminated from the FBI. (Doc. No. 17, Ex. 19.) Beverly testified that he did not make any changes to Haman's draft. (Beverly Dep. at 20.) Beverly also testified that, while he sometimes speaks with employees before they are dismissed, he does not normally question the subject during the course of an investigation if the subject is available, and did not speak with Plaintiff prior to approving the report. (*Id.* at 9, 22.) He also testified that he never saw the documents that Plaintiff allegedly provided to Dr. Barrum at SHSU, and has no *first-hand* knowledge of Plaintiff acting insubordinate, providing documents to non-FBI personnel, or not being a truthful person. (*Id.* at 15, 24-25.) Plaintiff contends that the report improperly failed to consider mitigating evidence suggesting, for example, that Plaintiff had done in good job in her normal work and as intern coordinator.

Plaintiff was informed in January 2006 that the FBI was proposing her dismissal. (Baldwin Dep. at 191-92.) She provided a written submission to OPR and travelled with her attorney to FBI Headquarters to present her case before the OPR Review Panel. (*Id.* at 193.)

On April 7, 2006, OPR Assistant Director Candice Will signed a final termination letter to Plaintiff. (Doc. No. 17, Ex. 9.) It found that the allegations against Plaintiff had been substantiated, and described the findings in detail. (*Id.*) It concluded that Plaintiff had 1) conducted an unauthorized investigation of an FBI intern; 2) engaged in unprofessional conduct and unauthorized disclosure by releasing information on an FBI intern to the intern's university without authority; 3) engaged in insubordination by failing to comply with a direct order to discontinue any further inquiry or investigation regarding the intern; and 4) lied under oath during the course of the administrative inquiry. (*Id.* at 2884.) The lying under oath charge was based on Plaintiff's stating in her sworn statement, "I do not recall [the Acting Assistant SAC] giving me a direct order. [Donnelly] was the only management official that told me as of August 18, 2004, to drop the issue regarding [the Intern]." (*Id.* at 2897.) OPR found that, in the face of testimony from both [Robinson and Donnelly], Plaintiff's failure to recall that order was not credible. (*Id.*) The OPR letter notes that this is Plaintiff's "third substantiated OPR inquiry" during her seven years at the FBI and that she had been suspended for a total of 42 days for her prior misconduct. (*Id.* at 2899.) It then states, "It appears that you have learned little from your past misdeeds. Your disciplinary history, coupled with your misconduct in this matter, reflects a patterned disregard for Bureau rules and regulations." (*Id.*)

In reaching her decision, Will read the investigative report but did not personally interview witnesses except for Plaintiff. (Doc. No. 20, Ex. 13, Candice Will Dep., June 9, 2010, at 18-20.) For example, Will determined that Plaintiff had lied under oath based on the prior signed, sworn statements of other witnesses who contradicted Plaintiff. (*Id.* at

29.) Plaintiff testified that she offered to take a polygraph test, but that Will and others did not agree to administer one to her. (Baldwin Dep. at 244-45.) Will later attested that she was not aware that Plaintiff had filed an EEO complaint until Plaintiff's dismissal hearing, although she acknowledged that she would have read the written response submitted by Plaintiff's attorney prior to the hearing, which referenced the EEO complaint. (*Id.* at 12-16.)

Plaintiff alleges that Haman retaliated against her for her previous employment discrimination lawsuit by engineering her dismissal. Although the previous suit was filed in September 2003, Plaintiff testified that she and her attorney began "working on [it] diligently" in June 2004. (Baldwin Dep. at 74-75, 221.) Plaintiff also notes that discovery began on May 18, 2004 and that initial disclosures were due by July 30, 2004. (*See* Doc. No. 20, Ex. 9.) Plaintiff testified that Haman was aware of her lawsuit, and that, even prior to June 2004, Haman's demeanor toward Plaintiff when she updated him about the lawsuit "was that he was disgusted with me . . . he would roll his eyes. He would put his feet up on the desk with his feet to me. He'd cross his arms." (Baldwin Dep. at 220.) She testified that when Haman gave Plaintiff her personnel file in June 2004, "he told me I could go wipe my butt with it," and that his demeanor toward her "just got worse and worse and worse as my time to work on the case got more intense." (Baldwin Dep. at 221-22.)

Assistant Division Counsel Donnelly testified that Haman told him in approximately the summer of 2004 that Plaintiff would be travelling to Albuquerque in relation to an EEO complaint she had filed. (Doc. No. 20, Ex. 3, at 6-7.) Donnelly also testified that Haman told him "it would not surprise him if Ms. Baldwin filed an EEO

complaint against Houston management concerning the ongoing OPR inquiry concerning Ms. Baldwin's involvement with [the Non-Paid Intern Program]." (*Id.* at 7.) Donnelly speculated that Haman meant he would not be surprised if Baldwin filed another complaint because people who have filed one EEO complaint often file multiple complaints. (*Id.*) Donnelly referred to such people as "frequent filers." (*Id.*)

Plaintiff presents evidence of instances in which FBI agents who were found to have lied under oath, disclosed sensitive information, or conduct unauthorized investigations were given little or no punishment. (*See* Doc. No. 20, at 12-15.) She contends that she received a much harsher punishment than similarly situated employees.

Plaintiff brings this suit alleging retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, *et seq.*

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and

unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.    LEGAL STANDARD FOR RETALIATION CLAIMS

Title VII makes it an unlawful employment practice for an employer:

> [T]o discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Under the *McDonnell Douglas* framework, the plaintiff first "has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show "(1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (citation omitted).

With regard to the third element, "a 'causal link' is established when the evidence demonstrates that the [adverse action] was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (citation omitted). "Although the plaintiff's burden at the prima facie stage is not

onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of [her] protected activity." *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003). "[T]he mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case." *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997). However, "[t]he plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision" in order to meet this burden. *Gee*, 289 F.3d at 345.

If a plaintiff makes out a prima facie case for retaliation, "the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action." *Id.* As the Supreme Court has explained this standard:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.

*Burdine*, 450 U.S. at 254 (citations and footnote omitted). "If the defendant satisfies this burden, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Gee*, 289 F.3d at 345. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

## IV.   ANALYSIS

### A.  PRIMA FACIE CASE

Defendant first argues that Plaintiff has not proven a causal link between her EEO complaint and her termination, and so has not made out a prima facie claim of retaliation. Plaintiff argues that she has demonstrated a causal link because the recommendation that led to her dismissal occurred close in time to her protected conduct, and her dismissal was engineered by Haman, who had shown animosity toward Plaintiff due to her discrimination lawsuit.

### 1.  Temporal Proximity

Plaintiff argues that the closeness in time between her protected conduct and the retaliatory actions establishes a causal link. Although "[c]lose timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation," *Swanson*, 110 F.3d at 1188, the Fifth Circuit has found a lapse of five months to be insufficient, absent other evidence. *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002). The parties in this case dispute how to properly count the time lapse between the protected conduct and the allegedly retaliatory conduct. Plaintiff argues that the date from which to begin counting is mid-June, 2004, when she informed Haman of communications with her attorney in the lawsuit, and when she received her personnel file (along with alleged animosity and hostility from Haman). Haman drafted a recommendation that Plaintiff be investigated on August 23, 2004, so Plaintiff argues that the time lapse was only two months. Defendant argues that the counting should begin either when Plaintiff initiated her EEO complaint in March 2002 or when she provided a copy of the federal complaint to FBI officials in Houston in September 2003. Defendant argues that the allegedly retaliatory events should be counted either from when Plaintiff

was actually terminated in April 2006 or from the August 2004 recommendation. Thus, Defendant argues that the time lapse was no less than eleven months, and as long as four years and one month.

The Fifth Circuit has looked to *the date an EEO complaint was filed* to calculate temporal proximity. *See, e.g.*, *Mitchell v. Snow*, 326 Fed. App'x 852, 856 n.6 (5th Cir. 2009) ("the complaint appears to be the relevant starting point"); *Strong v. University Healthcare System, L.L.C.*, 482 F.3d 802, 807-08 (5th Cir. 2007); *see also Hanks v. Shinseki*, 2010 WL 3000835, at *7 (N.D. Tex. July 28, 2010) ("[the plaintiff's] reading of the law would allow an employee to restart the temporal-proximity clock simply by notifying her employer every time she did anything to prosecute her EEO complaint"); *id.* at *7 n.42 (citing cases). Because knowledge by the employer of the protected conduct is also required, the appropriate date to begin calculating temporal proximity in this case is September 2003, when Houston officials, including Haman, became aware of Plaintiff's federal discrimination complaint.[1] Therefore, the employers' knowledge of Plaintiff's protected conduct and the first action that began the process of Plaintiff's dismissal were approximately eleven months apart. Without more evidence, this is insufficient under Fifth Circuit precedent to meet Plaintiff's burden to show a causal link. *See, e.g., Raggs*, 278 F.3d at 472 (5th Cir. 2002) (five-month proximity insufficient).

## 2. Haman's Retaliatory Intent

---

[1] There may well be instances in which a significant change occurs in a plaintiff's discrimination lawsuit such that her employer's reaction would be different in kind from learning of the discrimination complaint to begin with. However, the Court need not decide that broader question, because the changes in the lawsuit that Plaintiff alleges are routine steps of discovery in any lawsuit—such as exchanging initial disclosures. Plaintiff has not presented evidence sufficient to create a factual issue as to whether any significant change occurred in her lawsuit after September 2003 such that a later date should be used for this purpose.

Beyond mere temporal proximity, Plaintiff argues that Haman showed animosity toward Plaintiff due to her discrimination lawsuit and that as a result he "engineered" her dismissal. In support of this contention, Plaintiff cites her own testimony that Haman told her she could "wipe [her] butt with" her personnel file, that Haman yelled at her but did not yell at agents who had not filed EEO complaints, and that his hostile demeanor—such as crossing his arms and rolling his eyes when talking to Plaintiff—intensified as a result of Plaintiff's discrimination lawsuit. (Baldwin Dep. at 221-22.)

The Court finds that Plaintiff has presented sufficient evidence such that a reasonable jury could find a causal link between Haman's hostility and his investigation of Plaintiff. Plaintiff relies not only on her subjective belief, *see Peace v. Harvey*, 207 Fed. App'x 366, 369 (5th Cir. 2006) (per curiam) ("[plaintiff's] subjective belief the incidents were retaliatory, without more, is not sufficient to survive summary judgment"), but also on her testimony about specific statements and actions that Haman took. In addition, Haman's initial recommendation to OPR was made only a month after his alleged hostile statement and demeanor, so it is a reasonable inference that his hostility affected the existence and/or contents of his recommendation.[2] At the summary judgment stage, the Court must "refrain from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Although Plaintiff's testimony by no means conclusively proves that Haman retaliated against Plaintiff because of her lawsuit, it is sufficient to raise genuine issues of material fact on that question.

---

[2] As noted above, for purposes of proving a causal link through temporal proximity alone, the timing is generally counted from the date an EEO complaint was filed and the employer knew about it. However, evidence tending to prove that retaliatory behavior occurred in reaction to another event in a plaintiff's discrimination complaint process is still *relevant* to whether a causal link exists.

### 3.  "Cat's Paw" Theory

However, even if Haman conducted an investigation of Plaintiff and recommended her termination in retaliation for her protected conduct, Plaintiff still must show that a *decisionmaker* retaliated against her. In this case, Plaintiff does not contend that Haman was a decisionmaker; instead, Plaintiff relies on the "cat's paw" theory, contending that Will, as the decisionmaker, was influenced by Haman's recommendations in reaching her decision. *See Gee*, 289 F.3d at 346 (while the "statements and actions of ordinary employees are normally not imputable to the employer," "when the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact") (citations omitted).[3]

In the February 24 Order, the Court found that Will sufficiently conducted an independent review of Plaintiff's alleged misconduct to break the causal link. In so finding, the Court relied on the Fifth Circuit's standard for determining "cat's paw" liability. Under that standard, the causal link remained intact "where the decision-maker 'rubber-stamp[ed]' the firing recommendation of subordinates." *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001). However, "the causal link between the protected conduct and termination is broken where the official with final authority to fire employees

---

[3] As the Fifth Circuit recently explained:

> The term cat's paw is defined as "one used by another as a tool"; it was derived from a fable conceived by Aesop where a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing). Under the cat's-paw theory, if employee demonstrates a co-worker with a retaliatory motive had influence over the ultimate decisionmakers, that co-worker's retaliatory motive may be imputed to the ultimate decisionmakers, thereby establishing a causal link between the protected activity and the adverse employment action.

*Gollas v. University Of Texas Health Science Center At Houston*, 2011 WL 1834248, at *7 (5th Cir. May 12, 2011) (per curiam) (unpublished) (citing, *inter alia*, *Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1190 n. 1 (2011)).

conducts an 'independent investigation' in the course of reaching his or her decision." *Id.*; *see also Gee*, 289 F.3d at 346 ("The ultimate question, therefore, is whether the employee can demonstrate that others had influence or leverage over the official decisionmaker.") (citations omitted). Applying that standard, the Court in the February 24 Order held that, although Haman had some influence over Will, Will's independent investigation was sufficiently robust to break the causal chain. For example, the Court noted that Will wrote a seventeen-page letter to Plaintiff explaining the reasons for the decision, and that Will added a charge of lying under oath that had not been recommended by Haman.

A few days after the February 24 Order, the Supreme Court issued its opinion in *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011). Plaintiff moved to reconsider this aspect of the Court's holding on the basis that *Staub* altered the governing legal standard. *Staub* concerned a claim for discrimination in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301, *et seq.* The plaintiff argued that, although the decisionmaker had no hostility to the plaintiff's military obligations, two of the plaintiff's supervisors did, and the decisionmaker was influenced by their hostility. *Staub*, 131 S.Ct. at 1189-90. The Supreme Court rejected the Seventh Circuit's standard, which held that a "'cat's paw' case could not succeed unless the nondecisionmaker exercised such 'singular influence' over the decisionmaker that the decision to terminate was the product of 'blind reliance.'" *Id.* at 1190 (quoting *Staub v. Proctor Hospital*, 560 F.3d 647, 659 (7th Cir. 2009)). Instead, the Supreme Court held, "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment

action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194. The Supreme Court also rejected "a hard-and-fast rule" that an independent investigation by the decisionmaker breaks the causal link, explaining:

> [I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action (by the terms of USERRA it is the employer's burden to establish that), then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

*Id.* at 1193. Thus, *Staub* overturned the Fifth Circuit's legal standard for cat's paw liability, at least to the extent that it dictated that an independent investigation automatically broke the causal chain, and to the extent that it required a showing that the decisionmaker "rubberstamped" the recommendation of the retaliatory actor.

Although *Staub* concerned USERRA, the Supreme Court noted that the statutory language is "very similar to Title VII." *Id.* at 1191. Both statutes prohibit employment actions where discrimination based on a protected characteristic is "a motivating factor" in the employment action. *Id.* at 1190-91. Defendant does not dispute that *Staub* applies generally to Title VII claims, but instead argues that it does not apply to Title VII *retaliation* claims because the retaliation provision of Title VII does not contain the "motivating factor" language. *See* 42 U.S.C. § 2000e-3. Moreover, Defendant argues, Congress amended Title VII in 1991 to add the "motivating factor" language to Section 2000e-2(m) (which governs discrimination), but did not add that language to Section 2000e-3.

However, as Defendant acknowledges, the Fifth Circuit has made clear that, notwithstanding the difference in statutory language, a plaintiff may bring Title VII retaliation claims under a "mixed motive" theory of liability. *Smith v. Xerox Corp.*, 602 F.3d 320, 328-30 (5th Cir. 2010); *see also Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) ("In order to establish the causal link . . . , the evidence must show that the employer's decision to terminate was *based in part* on knowledge of the employee's protected activity.") (emphasis added). "[T]he kind of proof necessary for either discrimination or retaliation claims should be the same," and so mixed-motive liability in a retaliation case may be proven with circumstantial evidence. *Smith*, 602 F.3d at 331-32. Defendant argues that, because Plaintiff has not previously invoked the mixed-motive theory in this case, she may not do so at this stage in litigation. But the Fifth Circuit has rejected such a broad waiver rule in this context:

> [A] case need not be "correctly labeled as either a 'pretext' case or a 'mixed-motives' case from the beginning in the District Court" because the distinction often will not be known to the plaintiff prior to discovery. Instead, "[a]t some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives."

*Smith*, 602 F.3d at 333 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989)). "Put another way, if the district court has before it substantial evidence supporting a conclusion that both a legitimate and an illegitimate (i.e., more than one) motive may have played a role in the challenged employment action, the court may give a mixed-motive instruction." *Id.*

The Fifth Circuit recently applied the *Staub* inquiry in a Title VII retaliation case, affirming a grant of summary judgment because there was no evidence that the non-decisionmaking supervisor was motivated by retaliatory animus. *Gollas v. University Of*

*Texas Health Science Center At Houston*, 2011 WL 1834248, at *7 (5th Cir. May 12, 2011) (per curiam) (unpublished). Likewise, district courts in this and other districts have already applied *Staub* in the Title VII retaliation context. *See, e.g., Ridley v. Harris County*, 2011 WL 1485661, at *7 (S.D. Tex. Apr. 19, 2011); *Ordogne v. AAA Texas, LLC*, 2011 WL 1157338, at *9-10 (S.D. Tex. Mar. 28, 2011); *Palermo v. Clinton*, 2011 WL 1261118, at *7 (N.D. Ill. Mar. 31, 2011).[4] Based on the settled precedent allowing mixed-motive retaliation claims under Title VII, the Court agrees with those courts, and holds that *Staub* provides the legal standard for the cat's paw theory in Title VII retaliation claims. Thus, the Court must determine whether Haman's allegedly retaliatory actions were a proximate cause of Will's ultimate decision to terminate Plaintiff.

Applying this standard, the Court finds that factual issues remain as to whether Haman's actions were a proximate cause of Plaintiff's termination. "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Staub*, 131 S.Ct. at 1192 (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, ----, 130 S.Ct. 983, 989 (2010)). Haman drafted the recommendation to OPR to investigate Plaintiff, along with an investigation report that included an analysis of the *Douglas* factors. Although Haman's conclusions in those documents were approved by two other officials in the Houston office before the documents were sent to OPR, those officials relied in part on Haman's investigation of Plaintiff (in addition to relying on information from two assistant SACs and speaking to Dr. Barrum). (Beverly Dep. at 7-8, 13-14.) OPR then conducted an investigation of Plaintiff, and hear arguments from

---

[4] The Court is not aware of any case that has adopted Defendant's position that *Staub* does not apply to Title VII retaliation cases.

Plaintiff in writing and at a hearing. (Doc. No. 21, Ex. A.)[5] Will then reviewed the entire investigative file, including the documents from Houston, the Inspection Division's report, and arguments made by Plaintiff, and issued a seventeen-page letter to Plaintiff describing the reasons for her decision. (Doc. No. 21, Ex. B.) Based on this evidence, the Court cannot determine as a matter of law that Haman's recommendations were not a proximate cause of Will's ultimate decision. Even though FBI employees took additional investigative steps beyond Haman's recommendations, a reasonable jury could still find that Haman's actions were sufficiently influential to constitute a proximate cause. *See Staub*, 131 S.Ct. at 1192 ("The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes.") (emphasis in original).

Moreover, Plaintiff submits additional evidence with the Motion to Alter Judgment that makes her cat's paw argument significantly stronger.[6] Specifically, Plaintiff now presents to the Court a 24-page addendum that she alleges Haman submitted with his recommendation to dismiss Plaintiff.[7] (Doc. No. 26, Ex. 4.) The

---

[5] Plaintiff moves for the Court to strike the evidence Defendant presented as exhibits to his reply brief on the grounds that they amount to a second summary judgment motion made after the deadline for dispositive motions and without leave of the court. (*See* Doc. No. 22, at 1-2.) The Court finds it appropriate to consider the exhibits, as they respond to arguments presented in Plaintiff's response brief, and because Plaintiff has had the opportunity to present a sur-reply responding to the new evidence.

[6] Defendant objects that this evidence is not newly discovered and so cannot be raised in a Rule 59(e) motion. The Fifth Circuit has held that a Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478-79 (5th Cir. 2004). "Rather, Rule 59(e) 'serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence.'" *Id.* at 479 (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)). Although this evidence was produced to Plaintiff in discovery, it was among several thousand pages of documents, so it is possible that Plaintiff's counsel would not have discovered it despite significant efforts. Moreover, even if the evidence would have been somewhat relevant at the time of summary judgment briefing, its full significance could not have been known prior to the *Staub* ruling. Accordingly, the Court finds it appropriate to consider this evidence.

[7] It is difficult to tell from the document where it originated. A header on each page says, "EC from SAC, Houston to Inspection Division dated 01/03/05," but also says "ADDENDUM: OPR ADJUDICATION UNIT I (OPR AU I), DMM: DMM 12/12/05." In addition, there is a section titled "OPR ANALYSIS." The

addendum is very similar to Will's letter explaining the reasons for Plaintiff's termination—which was sent sixteen months after the addendum. Will's letter tracks the organization and language of the addendum. Numerous phrases are identical, including paraphrased summaries of third-parties' statements. The order of paragraphs, and the order of sentences within each paragraph, are almost identical. People are referred to differently—for example, the addendum refers to "SA Baldwin" while Will refers to "you"; the addendum refers to FBI employees by name while Will uses only their job title. Some portions of the addendum are omitted in Will's, and some new portions are added. However, the documents are substantially similar, and it would be difficult to conclude that Will did not base her letter on the addendum. This severely undercuts Defendant's argument that Will engaged in a robust independent review of the charges, as she essentially followed the factual conclusions, reasoning, and citation of evidence used in the addendum. In addition, the addendum contains a lying-under-oath charge. In the February 24 Order, the Court relied in part on the fact that Will *added* that charge based on her own investigation; the addendum undercuts that argument as well. In sum, the addendum raises additional issues of fact as to whether Haman's actions were a proximate cause of Will's ultimate decision to fire Plaintiff.

Accordingly, Plaintiff has established a prima facie case of retaliation for purposes of the summary judgment motion.

## B.  LEGITIMATE NON-RETALIATORY REASONS

---

*Douglas* factors analysis is different in the addendum and in Haman's investigation report, and the addendum ends with the statements, "OPR is proposing that SA Baldwin be dismissed from the rolls of the FBI" and "RECOMMENDATION: That the attached proposed dismissal letter be approved and forwarded." Accordingly, it is unclear to the Court whether the addendum was written by Haman or by someone in OPR. However, Defendant did not question Haman's authorship in his response to the Motion to Alter or at oral argument. At the very least, the authorship is a question of fact for the jury. Furthermore, genuine issues of material fact would remain even if the Court did not consider this evidence.

Defendant argues that, even if Plaintiff can establish a prima facie case of retaliation, the FBI had legitimate, non-retaliatory reasons for terminating Plaintiff's employment.

The Court finds that Defendant has met his burden to "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection" sufficiently to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *See Burdine*, 450 U.S. at 254. The FBI went through its internal investigation process and found that Plaintiff had 1) conducted an unauthorized investigation of an intern; 2) engaged in unprofessional conduct and unauthorized disclosure by released information about the intern to his university without authority; 3) engaged in insubordination by failing to comply with a direct order to discontinue any further inquiry or investigation regarding the intern; and 4) lied under oath. (*See* Doc. No. 17, Ex. 9.) Furthermore, Plaintiff had previously been suspended twice for violations of FBI policies, and Will, the Assistant Director of OPR, concluded that Plaintiff's behavior "reflects a patterned disregard for Bureau rules and regulations." (*Id.* at 2899.) Will found that Plaintiff's "misconduct in this matter seriously calls into question [her] ability to exercise the sound professional judgment required of an FBI Special Agent." (*Id.* at 2894.) These reasons are certainly sufficient to "raise an issue of fact" about whether the FBI's dismissal of Plaintiff was retaliatory.

### C.  PRETEXT

Because Defendant has met his burden to present evidence of a legitimate non-retaliatory reason for Plaintiff's dismissal, the burden shifts back to Plaintiff to prove that Defendant's "stated reason for the adverse action was merely a pretext for the real,

discriminatory purpose." *Gee*, 289 F.3d at 345. Plaintiff must prove that "that 'but for' the discriminatory purpose [s]he would not have been terminated." *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004); *see also Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) ("[E]ven if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct").

First, Plaintiff argues that she was treated differently than similarly-situated FBI employees. *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Disparate treatment of similarly situated employees is one way to demonstrate unlawful discrimination and retaliation.") "To raise an inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals." *Id.* "[A] plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001) (citations omitted). "Nearly identical" is not, however, "synonymous with 'identical.'" *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009); *see also id.* ("a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical").

In this case, Plaintiff has not demonstrated that employees under *nearly identical* circumstances were treated differently. OPR's decision to dismiss Plaintiff was based in

part on her two prior suspensions for violations of FBI rules, and on the conclusion that her conduct reflected "a patterned disregard for Bureau rules and regulations." (Doc. No. 17, Ex. 9, at 2899.) Plaintiff has presented no evidence that the agents she claims are similarly situated had any record of past misconduct or had been found to have shown a "patterned disregard" for FBI rules. It cannot be said that employees with no past record of misconduct or suspensions are situated nearly identically to Plaintiff. *See Lee*, 574 F.3d at 261 ("Each employee's track record at the company need not comprise the identical number of identical infractions, albeit *these records must be comparable*.") (emphasis added).[8] Accordingly, Plaintiff has failed to demonstrate pretext based on similarly-situated employees being treated differently.

However, Plaintiff *has* raised a genuine issue of material fact as to whether Haman's retaliatory actions were a "but for" cause of Plaintiff's termination. The Fifth Circuit has held that "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason." *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991); *see also LeMaire v. Louisiana Dept. of Transp. and Development*, 480 F.3d 383, 391 (5th Cir. 2007) ("Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext."). Rather than "try[ing] in court the validity of good faith beliefs as to an employee's competence[,] [m]otive is the issue." *Little*, 924 F.2d at 97. Even if Will had a good-faith belief that Plaintiff had committed the misconduct for which she was

---

[8] The exhibit Plaintiff relies on lists only one allegation of misconduct for each individual—for example, providing false information, disclosure of classified information, or unprofessional conduct. Even for Plaintiff, it lists only "unauthorized disclosure of sensitive information" although OPR also found her to have engaged in insubordination and lying under oath. Thus, the Court cannot tell based on that evidence whether even the final instances of misconduct by Plaintiff and the others are "nearly identical." This lack of detail may be due solely to a shortcoming in FBI record-keeping. Even assuming that the final instances of misconduct are identical, however, the lack of previous misconduct by others is fatal to Plaintiff's claim that the other employees were similarly situated.

charged, though, there is evidence that Haman was motivated by a discriminatory animus when he initiated and influenced the termination process. *See Ordogne*, 2011 WL 1157338, at *10.

As discussed above, Plaintiff has presented evidence that Haman initiated the investigation against Plaintiff and prepared reports recommending that she be terminated. Plaintiff has also presented evidence that Haman was motivated by intent to retaliate against Plaintiff. There is no indication in the evidence that Plaintiff would have been investigated if it had not been for Haman's initiation of those proceedings. Accordingly, the Court cannot conclude as a matter of law that Haman's retaliatory actions were not a "but for" cause of Plaintiff's termination.

The Court recognizes the potentially broad implications of this line of reasoning. For example, in theory, no matter how severe a plaintiff's misconduct, and no matter how clear the evidence implicating the plaintiff, summary judgment would never be appropriate if there was evidence that the employee who happened to initiate the investigation had retaliatory intent. There may be cases in which it will be clear as a matter of law that the retaliation was not a "but for" cause of the termination—for example, if the retaliating employee played a very minor role in the process, and it was inevitable that the plaintiff would be investigated and terminated for misconduct. However, this is not such a case.[9] At least where the decisionmaker was influenced by the investigations or recommendations of the retaliating employee, and where it is not clear that the plaintiff would otherwise have been investigated for the misconduct, summary judgment is inappropriate. Although the conduct for which Defendant maintains that

---

[9] At oral argument, neither party could suggest a simple principle with which to draw this line. The Court need not decide today where the line is drawn.

Plaintiff was terminated seems quite bizarre and problematic for a government official in Plaintiff's position, it remains a question of fact for the jury whether, *but for* Haman's retaliatory conduct, Plaintiff would have been investigated and terminated.

Accordingly, the Court finds that factual issues remain as to whether the reasons given for Plaintiff's termination were merely a pretext for the real, retaliatory reasons, so summary judgment is denied.

## V.      CONCLUSION

For the reasons discussed in this order, the Court **DENIES** Defendant's Motion for Summary Judgment. The Court will subsequently set a new trial date.


**IT IS SO ORDERED**.

**SIGNED** this 25th day of May, 2011.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE